IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**JAMES A. BAEZ,**                                        :
                                                         :
                     **Plaintiff**                       :        **CIVIL NO. 1:CV-06-01191**
                                                         :
**v.**                                                   :        **(Judge Rambo)**
                                                         :
**STINE,** *et al.,*                                     :
                                                         :
                     **Defendants**                      :

## <u>MEMORANDUM</u>

Presently before the court is Defendants' motion to dismiss or, in the

alternative, for summary judgment (Doc. 26), the *Bivens*[1] action brought by

Plaintiff James A. Baez ("Baez").  Defendants are prison officials and medical

staff from the Federal Prison Camp in Duluth, Minnesota ("FPC-Duluth") and the

Federal Prison Camp at Schuylkill ("FPC-Schuylkill") in Minersville,

Pennsylvania.[2]  Baez contends that Defendants were deliberately indifferent to his

serious medical needs, in violation of the Eighth Amendment.  For the reasons that

---

[1] *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *Bivens* stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official." *Butz v. Economou*, 438 U.S. 478, 504 (1978).

[2] Named as defendants are the following officials from FPC-Duluth: Warden D. Stine, Unit Manager D. Baker, and the "Entire Medical Staff."  Also named as defendants are the following officials from FPC-Schuylkill: Warden Ronnie Holt, Camp Administrator Steve Lake, Unit Manager Anthony Prantow, Case Manager C. Brill, the "Entire Medical Staff," and Correctional Officers Parkhurst, Lapoint, Bradshaw, and Miller.

follow, the motion for summary judgment will be granted in favor of Defendants.

## I.   <u>Statement of Facts</u>

To pierce the allegations of Baez, Defendants have submitted a statement of material facts (Doc. 33), supported by documentation and a declaration of one member of the medical staff of FPC-Schuylkill, as well as declarations of Bureau of Prisons ("BOP") employees who reviewed Baez's administrative remedy process.  These submissions reveal the following facts.

At FPC-Duluth, Baez indicated on his intake history form dated September 3, 2003, that he had a history of headaches.  (Doc. 33-2 at 19.)  However, Baez's medical condition was unremarkable until July 2004, at which time he reported to health services at FPC-Duluth with complaints of neck pain, and was prescribed Ibuprofin.  (*Id*.)

On August 4, 2004, Baez told medical staff during an evaluation that he had suffered neck pain after he fell backward while playing softball.  (*Id*.)  Staff diagnosed him with a neck strain and again prescribed Ibuprofin.  (*Id*.)  On August 9, 2004, Baez was examined and treated by staff for a superficial abrasion to his left temple.  (*Id*.)  He informed staff that he had bumped his head on the latch of his locker while he was bending over.  (*Id*.)

On August 17, 2004, Baez reported to health services with complaints of a headache.  (*Id.*)  He described the pain as resonating from the back of his skull, behind his eyes, and in his left ear.  (*Id.*)  He also had suffered a single episode of loss of equilibrium while playing the trumpet two days before the examination.  (*Id.*)  There were no obviously visible indications of illness.  (*Id.*)  Baez was subsequently diagnosed with "dull left ear drum, 1+ swelling in the nasal passages, tenderness over the left frontal sinus, a bilateral tenderness over the occipital prominence in the neck."  (*Id.*)  He was also diagnosed with myositis (muscle inflammation) and rhinitis.  (*Id.*)  Medical staff prescribed him an antihistamine and an anti-inflammatory, and advised him to use moist heat for muscle irritation.  (*Id.*)

On the evening of August 18, 2004, Baez was transported to a community hospital in an ambulance after he was found unconscious in the shower area of his dormitory.  (*Id.*)  Within approximately one hour a CT scan was performed, and Baez's condition was given a working diagnosis of sub-arachnoid[3] hemorrhage, and he was scheduled for surgery.  (*Id.* at 21.)  He was stabilized before surgery to alleviate intra-cranial pressure.  (*Id.*)  During surgery, doctors determined that

---

[3] The arachnoid membrane is the "delicate fibrous membrane forming the middle of the three coverings of the brain and spinal cord."  *Stedman's Medical Dictionary* 60 (American Heritage 2d ed. 2004).

Baez had suffered a left artery aneurysm rupture with sub-arachnoid hematoma. (*Id.*)  After this surgery was performed, another surgery was performed to clip the aneurysm on August 20, 2004.  (*Id.* at 36.) On September 2, 2004, Baez was fitted with a ventricular drainage shunt, and he was awake, responding to commands, and had opened his eyes.  (*Id.*)  He was transferred to a rehabilitation facility on September 8, 2004. (*Id.*)  While in rehabilitation, the shunt that was draining excess fluid from Baez's brain ventricle became infected with Methicillin Resistant Staphylococcus Aureus ("MRSA" or "staph infection").  (*Id.* at 21.)  As a result, Baez was returned to the hospital on September 26, 2004, where surgery was performed to replace the shunt on October 11, 2004.  (*Id.*, Doc. 33-5 at 52.)

After the shunt was replaced, Baez was transferred back to the rehabilitation center on October 16, 2004, to continue therapy.  (Doc. 33-2 at 21.)  On October 22, 2004, Baez was transferred to the Federal Medical Center for inmate patients in Rochester, Minnesota, for further therapy.  (*Id.* at 22.)  During an evaluation conducted there on November 3, 2004, Baez indicated that he was doing well, was not on any medications, was maintaining good exercise, and was gaining weight. (*Id.*, Doc. 33-5 at 52.)

Baez was transferred back to FPC-Duluth on January 4, 2005.  While there, Baez complained of occasional dizziness, light and noise sensitivity, and some

4

memory dysfunction.  (*Id*., Doc. 33-6 at 64.)  He was examined approximately a

dozen times by health services at FPC-Duluth between January and June 2005.

(Doc. 33-2 at 22.)

On June 16, 2005, Baez complained of an extreme headache, and was

immediately transported to the community hospital emergency room.  (*Id*.)

Doctors performed a CT scan, and found the aneurysm clip in place.  (*Id*., Doc. 33-

6 at 64.)  He was then returned to FPC-Duluth.

Baez was transferred from FPC-Duluth to FPC-Schuylkill on September 6,

2005.  Based on his history of a serious medical condition, Baez qualified for

quarterly evaluations at the chronic care clinic.  (Doc. 33-2 at 23.)  Routine

laboratory work was ordered.

On September 22, 2005, Baez was seen by Dr. Russell Hendershot for a

routine physical examination.  Baez was noted to be alert, oriented, and

ambulating with a cane.  (*Id*.)  He was prescribed Zantac for general gastric

distress.  (*Id*.)

On September 29, 2005, Baez was seen again by Dr. Hendershot.  He

denied any headache, fevers, chills, nausea, or vomiting.  (*Id*.)  He complained of

some muscle aches, but indicated that these pains were relieved by Motrin.  (*Id*.)

The examination revealed "no new neurological deficits."  (*Id*. at 24.)  He was

5

prescribed Motrin, as needed for any pain.

Baez was seen again by Dr. Hendershot for complaints of a headache in the left frontal area on October 14, 2005. (*Id*.) He described the pain as a seven out of ten, with ten being the worst. (*Id*.) However, an examination again revealed "no new neurological deficits." (*Id*.) Dr. Hendershot prescribed Tylenol 500mg, and scheduled a consultation with neurosurgery for a routine follow-up of the aneurysm. (*Id*.)

On October 25, 2005, Baez was seen by Physician's Assistant ("P.A.") Francisco Ortiz for complaints of a headache in the area of the shunt. He described the pain as a six out of ten. (*Id*.) However, his vital signs were stable and he had no fever. His prescriptions for Motrin and Zantac were renewed.

Baez was examined again by Dr. Hendershot on November 17, 2005, for complaints of severe headache, neck pain, and numbness in his hand. (*Id*.) Other complaints ranged from sensitivity to light and noise, and muscle pain. Baez suggested to Dr. Hendershot that he was not being treated properly. (*Id*.) He was subsequently diagnosed with a "chronic heavy cranial headache following surgery, secondary status post ventriculostomy." (*Id*. at 25.) He was prescribed the antibiotic Cipro, and offered Lamictal, as needed for the pain from the headaches. (*Id*.)

Baez was seen on two occasions in November 2005 at the Hershey Medical Center for CT scans of his brain.  Those scans did not reveal the source of Baez's headaches.  A follow-up neurological appointment was planned, but no definite date set.

On December 2, 2005, Baez was examined again by Dr. Hendershot for complaints of headaches.  He also complained of side effects from the prescribed medications.  Dr. Hendershot informed Baez of the results of both CT scans and the planned neurosurgical follow-up appointment.  (Doc. 33-2 at 26.)  Baez was also made aware of the chronic problems with his medical conditions and surgical issues including pain management for his chronic headaches.  (*Id*.)  However, he again suggested the FPC-Schuylkill health services were not treating him properly.  (*Id*.)  During the examination he asserted, "'you don't know what you are doing,' became belligerent and was asked to leave." (*Id*.)  He refused to sign the medical treatment refusal form before leaving the examination.  (*Id*.; Doc. 35 at 1.)

Four days later, during a routine optometry examination Baez's ocular heath was found to be normal.  Subsequently, at the end of December 2005, Baez was seen again by Dr. Hendershot for complaints of a throbbing headache.  (Doc. 33-2 at 26-7.)  Baez described the pain as a four or five out of ten.  (*Id*.)  He also complained of pain behind both shoulder blades, a burning sensation on the left

7

side of his face, light sensitivity, and an increase in headaches with greater

exposure to light and noise.  (*Id*.)  His neurological examination, however,

remained unchanged.

On January 3, 2006, Baez had a neurosurgical evaluation with Dr. Akash

Agarwal and others at the Hershey Medical Center's Neurosurgical Clinic.  The

doctors there reviewed a CT scan and performed a CT angiogram on Baez that

day. (Doc. 33-6 at 28.)  As a result of Baez's persistent physical symptoms and

because his aneurysm had been treated over a year earlier, Dr. Agarwal

recommended a cerebral angiogram, to be scheduled in the coming weeks.[4]  (*Id*.)

On January 5, 2006, Baez was seen by P.A. Kenton Hubble for complaints

of a headache and was prescribed Tylenol.  (Doc. 33-2 at 27.)  One week later,

Baez reported to the medical department for sick call complaining of headaches

and was seen by P.A. Hubble. (*Id*.; Doc. 35 at 35.)  Baez was prescribed Motrin,

but refused other medication for his chronic headaches.  (Doc. 33-2 at 27.)  He

complained of headaches again when he saw P.A. Hubble on February 6, 2006,

and was prescribed Tylenol 500mg.  (*Id*.)  His neurological examination revealed

---

[4] In his brief in opposition to the instant motion, Baez claims that FCP-Schuylkill medical
staff "refused to make an appointment for a cerebral angiogram."  (Doc. 35 at 2.)  After an
exhaustive search of the lengthy record in this case, the court finds no such evidence of a refusal
or deliberate delay.  Rather, the record shows that a cerebral angiogram was, in fact, performed
on April 24, 2006, which led to the decision to perform surgery for a right aneurysm on July 10,
2006.  (Doc. 33-2 at 29, 31-32.)

"no focal neurology deficits." (*Id.*)

Dr. Hendershot performed another examination of Baez on February 10, 2006.  Baez refused medication for his chronic headaches because, "he does not want to take anything because he believes the neurosurgeon did not state he should take any medications chronically." (*Id*. at 28.)  During the examination, he appeared to be in no apparent distress and was able to walk using a cane intermittently. (*Id.*)  Again, his neurological examination revealed "no new focal deficits." (*Id.*)

Baez reported to the medical department for sick call on March 27, 2006, for complaints of pain behind his left eye, with ear, shoulder and neck pain, and was seen by P.A. Ortiz.  He described the pain as a six out of ten, and a nine the prior day. (*Id.*)  Four days later, Baez was seen by Dr. Toa Chaw for a neurology chronic care visit. (*Id*. at 29.)  His neurological examination again revealed "no new focal deficits." (*Id.*)  Dr. Tow diagnosed Baez with "chronic headaches possibly secondary to vascular headache spasms status post cerebral aneurysm clipping." (*Id.*)  Dr. Tow prescribed Ibuprofen 600mg, and ordered diagnostic laboratory tests. (*Id.*)

On April 18, 2006, Baez reported to the medical department for sick call for complaints of a headache for four days, and was seen by P.A. Ortiz. (*Id.*)  P.A.

Ortiz noted that Baez had a chest cold and smelled of cigarette smoke.  (*Id*.)

Again, his neurological examination revealed "no new focal deficits."  (*Id*.)  Baez

refused medication for the chronic pain, stating that he wanted to discuss his

medication with doctors at Hershey Medical Center following his planned cerebral

angiogram.  (*Id*.)  That cerebral angiogram was performed at Hershey Medical

Center on April 24, 2006.  (*Id*.)

Three days later, Baez reported to P.A. Ortiz for complaints of numbness

and tingling on his left side.  (*Id*.)  That same day, Baez received an incident report

for disobeying an order of FPC-Schuylkill staff and was placed in the Special

Housing Unit ("SHU").  (*Id*. at 30.)

Dr. Chaw evaluated Baez in the SHU on April 28, 2006, for Baez's chronic

pain.  (*Id*.)  Again, "no new neurological deficits were noted."  (*Id*.)  Dr. Chaw

gave Baez an injection of Tordal 30mg for the pain and prescribed Motrin as

needed for continued headaches.  (*Id*.)  He also scheduled diagnostic x-rays and

laboratory tests, as well as follow-up care.  (*Id*.)

Doctors at the Hershey Medical Center reviewed the test results of the April

24, 2006, cerebral angiogram in early May 2006.  While the official reading of the

results revealed no aneurysm or other vascular abnormality, Dr. Robert Harbaugh

expressed concern that Baez may have a "small left internal carotid-posterior

communicating artery aneurysm on the right." (Doc. 33-6 at 21.)  He planned to see Baez in order to discuss the angiographic findings.

On June 23, 2006, Baez was seen again by Dr. Hendershot for routine neurological chronic care.  (Doc. 33-2 at 31.)  At this time, he was informed of differing neuroradiology and neurosurgical interpretations of his cerebral angiogram.  (*Id*.)  Dr. Hendershot educated him on the risks and benefits of possible surgery.  (*Id*.)

On July 10, 2006, Baez was admitted to the Hershey Medical Center for surgical repair of the right internal carotid artery aneurysm.  (*Id*. at 31-32.)  He was released on July 13, 2006, and returned to FCP-Schuylkill.  Dr. Hendershot evaluated him that same day, and prescribed Percocet for severe pain for five days, and Motrin 600mg for moderate to severe pain for seven days.  (*Id*. at 32.)

Baez was evaluated by FCP-Schuylkill medical staff several times in July 2006 for post-surgical examinations.  On July 31, 2006, Baez was transported to the community hospital emergency room for a possible infection to the suture site. (*Id*. at 33.)  The following month he was informed that he had contracted another staph infection, and treatment was assigned.  (*Id*.)  In addition, medical staff educated him on staph infections, as well as hygiene issues.  (*Id*.)

The instant action was commenced on June 21, 2006, alleging "violation of

the United States Constitution, 8th Amendment, showing total disregard for the

safety of the life of a human being, before, during and after major surgery." (Doc.

1 at 1.)  Defendants now move for summary judgment on all claims.  Specifically,

Defendants contend that summary judgment for defendants is appropriate because

the material facts establish that they were not deliberately indifferent to Baez with

regard to the medical care provided to him for his serious medical condition.

    On January 24, 2007, Baez filed a brief in opposition to Defendants' motion

for summary judgment.  Although he did not file a counter-statement of material

facts,[5] he attaches as exhibits to his brief documentary evidence related to

exhaustion of administrative remedies[6] and an administrative tort claim.[7]  In

addition, the final twenty-one (21) pages of attached documentation contains a

---

[5] In opposing a motion for summary judgment, M.D. Pa. Local Rule 56.1 provides, in relevant part, that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

[6] Defendants do not dispute that Baez has exhausted his administrative remedies with respect to his Eighth Amendment claim.

[7] To the extent that Baez's claim can be construed as a claim under the Federal Tort Claims Act ("FTCA"), Baez acknowledges that any claim under the FTCA is precluded by the six-month statute of limitations set forth in 28 U.S.C. § 2401(b) ("A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.").  The final denial by the BOP's office of general counsel was sent by certified mail to Baez on November 1, 2005.  (Doc. 33-2 at 12; *see also* Doc. 1 at 3, "I also filed a Tort Claim, but it was denied by the Northeast Region of the Federal Bureau of Prisons and is no longer in effect.")

chronological set of handwritten notes by Baez relating to his medical care from

September 2005 through January 2007.  The court will consider this

documentation, as well as Defendants' statement of material facts, in resolving the

instant motion.

## II.    **Standards of Review**

### A.    **Motion to Dismiss**

Defendants have filed a motion which, in part, seeks dismissal of the

complaint on the grounds that Baez's complaint fails to state a claim upon which

relief can be granted, as provided by Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  The motion, however, goes beyond a simple motion to dismiss under

Rule 12(b)(6) because it is accompanied by evidentiary documents outside the

pleadings contravening Baez's claims.  Rule 12(b) provides, in pertinent part, as

follows:

> If, on a motion asserting the defense numbered (6) to dismiss for
> failure of the pleading to state a claim upon which relief can be
> granted, matters outside the pleading are presented to and not
> excluded by the court, the motion shall be treated as one for summary
> judgment and disposed of as provided in Rule 56, and all parties shall
> be given reasonable opportunity to present all material made pertinent
> to such a motion by Rule 56.

Fed. R. Civ. P. 12(b).  The court will not exclude the evidentiary materials

13

accompanying Defendants' motion to dismiss because Baez also has been given a reasonable opportunity to present material relevant to the motion.  Thus, Defendants' motion to dismiss, or in the alternative, for summary judgment, will be treated solely as seeking summary judgment.

### B.   <u>Summary Judgment</u>

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id.* at 249. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  *Saldana*, 260 F.3d at 232; *see also Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D. Pa. 1992).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply

sit back and rest on the allegations in its complaint.  *See Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986)*.*  Instead, it must "go beyond the pleadings and by [its]

own affidavits, or by the depositions, answers to interrogatories, and admissions

on file, and designate specific facts showing that there is a genuine issue for trial."

*Id.* (internal quotations omitted); *see also Saldana*, 260 F.3d at 232 (citations

omitted).  Summary judgment should be granted where a party "fails to make a

showing sufficient to establish the existence of an element essential to that party's

case and on which that party will bear the burden at trial."  *Celotex*, 477 U.S. at

322-23.  "'Such affirmative evidence – regardless of whether it is direct or

circumstantial – must amount to more than a scintilla, but may amount to less (in

the evaluation of the court) than a preponderance.'"  *Saldana*, 260 F.3d at 232

(quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir.

1989)).

## III.   <u>Discussion</u>

In their brief in support of the motion for summary judgment, Defendants

raise the issue of qualified immunity.  The doctrine of qualified immunity provides

that government officials performing "discretionary functions," are shielded from

suit if their conduct did not violate a "clearly established statutory or constitutional

right[] of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001).  This doctrine provides not only a defense to liability, but "immunity from suit." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To determine whether government officials have lost their immunity, the court must first decide if the plaintiff has demonstrated "a deprivation of an actual constitutional right." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999); *see also Saucier*, 533 U.S. at 201 ("A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?")*; Doe v. Groody*, 361 F.3d 232, 237 (3d Cir. 2004); *accord Wright v. City of Philadelphia*, 409 F.3d 595, 600-01 (3d Cir. 2005) (noting that six Courts of Appeals have ruled that first step in a qualified immunity analysis is whether a constitutional violation has occurred).  Second, if the court believes a constitutional violation has occurred, it must consider whether the right was "clearly established." *Saucier*, 533 U.S. at 201.

When immunity is raised at the summary judgment stage, the court's analysis of the merits of the claims for purposes of summary judgment essentially merges with its analysis of the existence of a deprivation of federal rights for

16

purposes of immunity.  *See Gruenke v. Seip*, 225 F.3d 290, 299-300 (3d Cir. 2000); *Russoli v. Salisbury Twp.*, 126 F. Supp 2d 821, 839-42 (E.D. Pa. 2000); *see also Grant v. City of Pittsburgh*, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).").

Proceeding under the above framework, the court will examine Baez's Eighth Amendment claim to determine whether Defendants are entitled to qualified immunity, and whether summary judgment is warranted.

To demonstrate a *prima facie* case of Eighth Amendment cruel and unusual punishment based on the denial of medical care, a plaintiff must establish that the defendants acted with "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993).  There are two components to this standard: Initially, a plaintiff must make an "objective" showing that the deprivation was "sufficiently serious," or that the result of the defendant's denial was sufficiently serious.  Additionally, the plaintiff must make a "subjective" showing that defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991);

*see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).[8]

This test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients.  Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment." *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa.), *aff'd*, 103 F.3d 691 (1996) (citing *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979), quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

When an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist.  *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988).  Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim.  *Lanzaro*, 834 F.2d at 346.  Only flagrantly egregious acts or omissions can violate the standard.  Medical negligence alone cannot result in an Eighth Amendment violation, nor can any disagreements over the professional judgment of a health

---

[8] The "deliberate indifference to serious medical needs" standard is obviously met when pain is intentionally inflicted on a prisoner, where the denial of reasonable requests for medical treatment exposes the inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care.  *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (quoting *White v. Napolean*, 897 F.2d 103, 109-110 (3d Cir. 1990); *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

care provider. *White*, 897 F.2d at 108-10.

In the instant case, throughout the relevant time period, Baez was seen on numerous occasions by various medical personnel. He was repeatedly evaluated and was prescribed medication to ease his discomfort. Diagnostic tests were ordered, and performed, to facilitate treatment. Multiple surgeries were performed. Unfortunately, despite all the medical intervention, Baez continues to suffer from discomfort. This is clearly a case where Baez has been given medical attention and is dissatisfied with the results. An inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. *Durmer*, 991 F.2d at 69; *Spruill*, 372 F.3d at 235. Courts will not second guess whether a particular course of treatment is adequate or proper. *Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997). Moreover, there is nothing in the record demonstrating that any delay in conducting Baez's cerebral angiogram or, for that matter, any other procedure, was deliberate or intentional on the part of any defendant. Under these circumstances and based upon the well-documented course of treatment set forth in the record, the court finds that Defendants were not deliberately indifferent to Baez's serious medical needs. Thus, Baez fails to establish a constitutional violation and qualified immunity shields Defendants from suit. Defendants' motion for summary judgment on this issue will be

Case 1:06-cv-01191-SHR-AM   Document 39   Filed 07/31/07   Page 20 of 21

granted.[9]

      An appropriate order is attached.


_____

SYLVIA H. RAMBO
United States District Judge

Dated:      July \_\_\_, 2007.


---

[9] Defendants have also raised various independent grounds as to why the instant complaint should be dismissed as to individual defendants. Defendants contend that the "Entire Medical Staffs" of FPC-Duluth and FPC-Schuylkill and certain other defendants should be dismissed based upon the doctrine of sovereign immunity. The doctrine of sovereign immunity precludes a plaintiff from bringing a *Bivens* action against a federal agency, *see FDIC v. Meyer*, 510 U.S. 471, 484-86 (1994). Suits brought against federal officials in their official capacities are to be treated as suits against the employing government agency. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (cited with approval in *Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1143 n.3 (3d Cir. 1995)). As a result, a *Bivens* suit brought against an individual federal official acting in his official capacity is barred by the doctrine of sovereign immunity, *see Meyer*, 510 U.S. at 484, and the court lacks jurisdiction to hear the claim, *see Kabakjian v. United States*, 267 F.3d 208, 211 (3d Cir. 2001) (holding that district courts lack jurisdiction to hear claims brought against the United States unless Congress has explicitly waived sovereign immunity). In the instant case, to the extent that Baez seeks to impose liability on the defendants in their official capacities as employees of the Federal Bureau of Prisons, Baez's *Bivens* claims against these defendants are barred by the doctrine of sovereign immunity.

      Defendants further assert that Defendants Stine, Baker and the "Entire Medical Staff" of FPC-Duluth should be dismissed for lack of personal jurisdiction. Because Stine, Baker and the "Entire Medical Staff" of FPC-Duluth do not reside or work in Pennsylvania and their nominal connection with Pennsylvania is by virtue of the performance of their official duties which does not constitute "purposeful availment" of any of the benefits of Pennsylvania law, they shall be dismissed as defendants from this suit. *See Santana Prods., Inc. v. Bobrick Washroom Equip.*, 14 F. Supp 2d 710, 713 (M.D. Pa. 1998). *See also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**JAMES A. BAEZ,**                          :
                                            :
      **Plaintiff**              :          **CIVIL NO. 1:CV-06-01191**
                                            :
**v.**                                      :          **(Judge Rambo)**
                                            :
**STINE,** *et al.,*                        :
                                            :
      **Defendants**            :

## ORDER

AND NOW, this 31st day of July, 2007, upon consideration of Defendants' motion to dismiss or, in the alternative, for summary judgment (Doc. 26), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1.    Defendants' motion for summary judgment (Doc. 26) is GRANTED.

2.    The Clerk of Court is directed to ENTER judgment in favor of the defendants and against the plaintiff.

3.    The Clerk of Court is further directed to CLOSE this case.

S/Sylvia H. Rambo
United States District Judge